UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERIDIAN NORTH AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> RAMI SAKER, <br><br> Defendant. | Civil Action No. <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> (With Jury Demand) |

Plaintiff Meridian North America, Inc. ("Meridian"), as and for its complaint against defendant Rami Saker ("Mr. Saker"), alleges:

## NATURE OF ACTION

1. This action is brought to remedy the unlawful, duplicitous and disloyal conduct of Mr. Saker, the former COO of Meridian, a financial technology company, in the theft of its trade secrets and other confidential, proprietary documents and information, in violation of his Employment Agreement and Confidential Information and Invention Assignment Agreement with Meridian, executed when he first joined the company in 2023, and in violation of Federal law. Meridian also seeks temporary, preliminary and permanent injunctive relief to prevent further harm to Meridian's commercial interests stemming from his conduct.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Meridian asserts claims for relief under 18 U.S.C. § 1836.

3. This Court has supplemental jurisdiction over Meridian's state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same nucleus of operative facts as Meridian's Federal claims and form part of the same case or controversy.

4. This Court has personal jurisdiction over Mr. Saker because he is a resident of the State of New York.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Meridian's claims occurred here.

## PARTIES

6. Meridian is a Delaware corporation with its principal place of business at 110 Greene Street, Suite 507, New York, NY 10012.

7. Mr. Saker is an individual who resides and is domiciled at 215 North 11th Street, Apartment 3, Brooklyn, New York 11211.

## FACTUAL ALLEGATIONS SUPPORTING ALL CLAIMS FOR RELIEF

**I.   MERIDIAN'S BUSINESS**

8. Meridian is a fintech company that enables overseas banks or other financial institutions to issue USD-denominated virtual bank accounts to their customers/users, permitting them to convert USD into local currency and vice versa in real time and obviating the need to process foreign currency transactions via SWIFT or other intermediaries.[1]

9. The virtual accounts are maintained with FDIC-insured bank partners of Meridian which hold the subject funds.

10. The business is based on dual licensure and Meridian's proprietary Real-Time Deposit ("RTD") network.

---

[1] SWIFT is the acronym for Society for Worldwide Interbank Financial Telecommunication. Global network messaging systems such as SWIFT provide the avenue to electronically process foreign currency exchanges.

11.　　Meridian affiliates are licensed both in the United States and overseas markets. Meridian Payments United States, Inc. is registered with FinCEN[2] as a "money services business" and holds "money transmitter licenses" issued by state regulatory authorities. Meridian Payments Philippines Inc. holds an operator of payment system ("OPS") license granted by the Central Bank of the Philippines (*Bangko Sentral ng Pilipinas*) ("BSP").

12.　　Dual licensure permits overseas banking partners to open USD-denominated virtual accounts using local government IDs to satisfy FinCEN requirements.

13.　　Once a virtual account has been opened, the holder of the corresponding local account can view both together in the banking application or digital wallet.

14.　　Transfers between the local and virtual accounts settle in real time via Meridian's shared ledger and foreign exchange credit settlement system.

15.　　For example, a Filipino GCash[3] user can open up a virtual account in his/her name using his/her Philippine ID. USD can be transferred from the United States to the virtual account via ACH. It can then be held as USD in the virtual account or converted to Philippine Pesos held in the local account. The entire experience happens within GCash with no interaction between the user and Meridian.

16.　　Meridian generates revenue from monthly platform fees, per-account issuance, yield on balances within accounts and foreign exchange spread.

---

[2] FinCEN is an acronym for the Financial Crimes Enforcement Network, a bureau of the United States Department of Treasury responsible for combatting international money laundering, terrorist financing and other financial crimes.

[3] GCash is a Philippine mobile payment/digital wallet service (nonbank financial institution) with approximately 90 million users that Meridian partners with.

17. The business is extremely competitive. There are many fintech companies engaged in the business of seeking to provide USD virtual bank accounts to persons and businesses located outside the United States.

18. Commercial success hinges not only on partnerships with financial institutions in the United States and the overseas market, and development of a network that provides instant liquidity across local and virtual accounts, but also on regulatory approval abroad.

19. For Meridian, regulatory approval in the Philippines was granted December 9, 2024 following approximately two years of effort, innovative strategies for addressing regulator concerns and considerable investment.

20. The BSP has granted OPS licenses to only 310 entities.

## II.  MR. SAKER'S EMPLOYMENT WITH MERIDIAN

### A.  The Employment and Confidentiality Agreements

21. Mr. Saker joined Meridian on or about November 8, 2023 as its Payments, Operations and Expansion Manager.

22. The terms of his employment were set forth in a letter agreement between him and Meridian, dated November 8, 2023 ("Employment Agreement"), attached as Exhibit 1. In conjunction with the Letter Agreement, and as a condition precedent to employment under Employment Agreement § 6(a), he executed a Confidential Information and Invention Agreement with Meridian ("Confidentiality Agreement"), attached as Exhibit 2.

23. Pursuant to Employment Agreement § 1(b), Mr. Saker agreed to "not assist any other person or organization in competing with the Company [defined as Meridian] or in preparing to engage in competition with the business or proposed business of the Company."

24. Confidentiality Agreement § 2 provides "[d]uring the Relationship [employment], I … will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company."

25. Confidentiality Agreement § 3(a) provides:

> I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company and only to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information[4] that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

26. Under Confidentiality Agreement §4, all inventions, discoveries, developments, trade secrets, and original works of authorship—whether or not patentable or copyrightable—that Mr. Saker solely or jointly authors, discovers, develops, conceives, or reduces to practice during the employment relationship are assigned to and become the sole property of Meridian.  Mr. Saker agreed to hold all such inventions in trust for the sole right and benefit of the Company, and irrevocably assigns to the Company all right, title, and interest worldwide in and to these

---

[4] Confidentiality Agreement § 3(b) defines "Confidential Information" as "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans … developments … processes, formulas, techniques … price lists, pricing methodologies … licenses, contract information, business plans … or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation." Confidentiality Agreement § 4(c) defines "Company Inventions" in turn as "all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship" and "Inventions" as "discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable … include[ing] any new … method, procedure, process, technique, use … system … design or configuration of any kind, or any improvement thereon."

5

inventions, including all related patent, copyright, trademark, trade secret, and other intellectual property rights. Additionally, if Mr. Saker incorporates any pre-existing invention into a Company product or process, the employee granted Meridian a nonexclusive, royalty-free, perpetual, worldwide license to practice and exploit that invention.

27. Confidentiality Agreement § 5, entitled "Company Property; Returning Company Documents," provides:

> I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, computers, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. ***I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company or its successors or assigns***.

28. Confidentiality Agreement § 6 provides that "[t]n the event of the termination of the Relationship, I agree to sign and deliver the 'Termination Certification' attached hereto as Exhibit B; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement."

29. The Termination Certificate in turn certifies compliance with the Confidentiality Agreement, and that "I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of

6

authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees."

30. It also includes an acknowledgment of Mr. Saker's access to Meridian's trade secrets and of Meridian's intent to pursue its rights under applicable law as the circumstances warrant.

31. In Section 7 of the Confidentiality Agreement, Mr. Saker agreed that

> during the periods during which I am restricted in taking certain actions by the terms of this Agreement (the "**Restriction Period**"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I also understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. I further agree that, upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

32. Section 8 of the Confidentiality Agreement contains restrictive covenants that prohibit Mr. Saker from, among other things, directly or indirectly soliciting, inducing, recruiting, or encouraging any of Meridian's employees or consultants to terminate their relationship with the Company for a period of twelve months following the termination of his employment. Section 8 further prohibits Mr. Saker from negatively influencing, soliciting, or attempting to influence any of Meridian's clients, licensors, licensees, or customers to direct purchases of products or services to any competitor of Plaintiff.

### III.   MR. SAKER'S PROMOTIONS AND RESIGNATION

33. In or about February 2024, Mr. Saker was appointed Head of Financial Institutions and Expansion, whereupon he had direct responsibility over Meridian's relationships with overseas financial institutions and regulatory authorities.

34. In December 2025, he was named COO of Meridian, a promotion he actively pursued over at least the last year.

35. In the weeks following his promotion to COO, he did not fulfill his responsibilities as COO. In practical terms, he checked out.

36. On February 20, 2026, Mr. Saker notified Meridian's co-founder and President Bradley Riss that he was resigning and would be joining Fin.com a/k/a UAB Wind Technologies as its COO.

37. Fin.com is a direct competitor of Meridian. On December 17, 2025, Fin.com announced that it would be partnering with Noah, which provides infrastructure for converting fiat currency to stablecoin and vice versa, to launch its own virtual account program in, among other places, the Philippines. Finextra.com reported:[5]

> The partnership sees Fin.com customers able to receive bank transfers in EUR and USD through local virtual accounts issued and regulated by Noah. Funds arriving into these accounts are automatically converted into stablecoins inside the Fin.com apps.
>
> ***Once the users have stablecoins, they can also off-ramp in local fiat via Fin.com's proprietary rails in countries like*** India, Bangladesh, Pakistan, ***Philippines***, Nepal and Singapore.
>
> Noah handles all onboarding, KYC, AML checks, and transaction monitoring for users who activate the feature. The first rollout will be available to 200,000 users initially, with broader expansion expected over the coming months.
>
> Shah Ramezani, CEO, Noah, says: "Fin.com is building a global wallet for everyday people. By powering their EUR and USD account infrastructure behind the scenes, we remove the friction of international money movement while Fin.com stays focused on product and user experience."

---

[5] https://www.finextra.com/newsarticle/47067/noah-and-fincom-launch-fiat-to-stablecoin-virtual-accounts. See also https://fintech.global/2025/12/17/noah-and-fin-com-launch-virtual-accounts-for-instant-global-access (similar).

(Emphasis added).)

38. Thus, although Meridian and Fin.com effectuate international payment flows in different ways—Meridian stores USD in FDIC-insured virtual bank accounts that convert to local currency stored on a local account, whereas Fin.com stores USD in stablecoins that are "off-ramped" into local accounts—the purpose of both is to expedite conversion between USD and local currency, and they compete for the same international payment flows e.g. remittances from the United States to Philippines, remote workers etc.

39. In addition, like Meridian (as discussed below) which is exploring obtaining UAE regulatory approval, Fin.com has obtained an Innovation Testing license issued by the Dubai Financial Services Authority.

40. Mr. Saker's formal written resignation followed on February 25, 2026.

## IV. MR. SAKER DOWNLOADED CONFIDENTIAL AND PROPRIETARY DOCUMENTS, INCLUDING TRADE SECRETS, AFTER GIVING NOTICE

41. Meridian stores commercially sensitive documents, including internal guides to obtaining regulatory approval, proprietary settlement flows, pricing information and strategies, materials shared with central banking authorities, and Meridian's "explainer" for obtaining regulatory approval and licensure in the Philippines, on the Company's Google Drive. Meridian created these guides through

42. Meridian restricts access to documents stored on the Company's Google Drive to those employees who needed to access the same in connection with their professional duties.

43. However, as C-level executive, Mr. Saker had access to substantially all documents saved to the Google Drive.

9

44. Meridian's Google Drive access logs show that on February 23 and February 24, 2026—shortly after his verbal resignation—Mr. Saker was downloading (not simply viewing) numerous files, all very commercially sensitive ones.

45. The downloads were made to his personal computer, which Mr. Saker used for work purposes.

46. The documents downloaded by Mr. Saker include, without limitation, the following:

- <u>BSP Dollar Account Entities and Information Flow Explainer Presentation</u>. This includes Meridian's proprietary settlement flow for USD to Philippine Pesos transactions that was negotiated with the BSP and which served as the basis for its obtaining regulatory approval.

- <u>Virtual Account Analytics Dictionary</u>.  This includes proprietary internal standards and metrics for how to analyze fund flows through virtual bank accounts.

- <u>UAE Meridian - Clearing Account Application Form</u>.  The Meridian's client onboarding form for information collected to provide specialized reliance payments models to customers seeking to clear USD to the UAE.

- <u>2026 Meridian Deals Spreadsheet</u>.  Meridian's deal sheet for this year listing deal values, stages and next steps for financial services transactions Meridian had in the works.

- <u>Agent of the Payee Exemption States Spreadsheet</u>.  This reflects Meridian's legal analysis for all U.S. states to reduce licensing burdens for certain activities.

- <u>Pricing Proposal Spreadsheet</u>.  A highly detailed pricing sheet for a customer that could process processes over $2 billion annually through Meridian.

47. Each of these documents has confidential and proprietary commercially sensitive information.

48. These documents had no connection to Mr. Saker's then-current, and non-existent work obligations (having previously announced he was resigning), such that the only conceivable purpose for his having downloaded these is for use in connection with his new position at Fin.com.

49. In a discussion between Mr. Saker and Meridian's co-founder and President concerning his resignation, Mr. Saker professed ignorance of his obligations under the Confidentiality Agreement and inquired as to whether he was prohibited from pursuing transactions with persons with whom Meridian had engaged with or just with persons already contracted with Meridian. Meridian's President reiterated that Mr. Saker is bound by the covenants in his Employment and Confidentiality Agreements and to proceed accordingly.

50. Mr. Saker's professed ignorance prompted Meridian inspect the Google Drive logs and discovered that he had accessed and downloaded the Company's confidential, proprietary and trade secret information.

51. After learning of his improper, unauthorized access and downloading of Company documents, Meridian immediately terminated his access to the Google Drive.

V. **MR. SAKER'S SURRUPTICIOUS SOLICITATION OF MERIDIAN EMPLOYEES, AND OTHERS AND ATTEMPT TO REVOKE HIS SIGNED TERMINATION CERTIFICATE**

52. Since Meridian learned of Mr. Saker's unauthorized theft of company proprietary information, Meridian has also learned that, in the weeks leading up to giving notice of his resignation, he solicited at least one highly valued Meridian employee, a lynchpin member of Meridian's team, to work with him at Fin.com.

53. Approximately three weeks ago, Mr. Saker mentioned to Meridian's Chief of Staff—a key employee who had previously reported to him—that a company that was going to offer him a half a million dollars to go work for it. He made repeated comments to her about his anticipated departure, including, in words or substance, that if he leaves, he's taking her with him and if he goes, he would want to make sure she comes with him. About a week before his departure, he told the Chief of Staff, in words or substance, that they were going to have to grab coffee, just the two of them.

11

54. As noted above, under Section 6 of the Confidentiality Agreement, Mr. Saker agreed, upon his separation from Meridian, to execute a Termination Certificate.

55. At 2:53 p.m. on February 25, 2025, he executed via Docusign a package of documents that included an executed Termination Certification.

56. However, at around 3:00 p.m. that day, Mr. Saker through counsel advised Meridian that he was unwilling to sign the Termination Certificate, stated that Mr. Saker "absolutely did NOT execute these documents" and demanded that Meridian "void out these documents immediately."

57. Mr. Saker's efforts to solicit valued Meridian employees in violation of restrictive covenants and his conflicting conduct—executing the Termination Certification and then immediately disavowing execution through counsel—evinces consciousness of guilt and an intent to retain and use Meridian's trade secrets and confidential information.

58. Meridian responded in writing at 8:38 p.m. on February 25 that the purported objection to execution of the Termination Certificate was not well taken, in light of his having agreed to sign same upon termination of his employment, pursuant to Confidentiality Agreement § 6, notified Mr. Saker that it was aware of the downloads and cautioned that absent execution of the Termination Certificate Meridian could only assume he is in breach of his confidentiality obligations.

59. Meridian demanded that Mr. Saker also confirm that he has complied with section 7 of the Confidentiality Agreement, which provides:

> I agree that during the periods of time during which I am restricted in taking certain actions by the terms of this Agreement (the 'Restriction Period'), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement.

60. Meridian also demanded that Mr. Saker "preserve his devices, electronically stored information concerning the Company, including emails, text messages (whether transmitted by SMS, Whatsapp or any other application), phone records and communication encryption applications/records, work product, along with any hard copy documents in his custody."

61. To date, neither Mr. Saker nor his counsel have responded to Meridian's demands.

**FIRST CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets under 18 U.S.C. § 1836**

62. Meridian hereby adopts and realleges the allegations set forth in all of the preceding paragraphs above as if set forth fully herein.

63. Among the multitude of documents Mr. Saker downloaded after announcing his resignation were the BSP Dollar Account Entities and Information Flow Explainer Presentation, the Virtual Accounts Analytics Dictionary and Pricing Proposal Spreadsheet.

64. The BSP Dollar Account Entities and Information Flow Explainer Presentation contains trade secrets. It is in practical terms a step-by-step guide for becoming a BSP-registered OPS, which may of Meridian's fintech competitors have failed to do despite considerable time, effort and investment.

65. In the parlance of 18 U.S.C. § 1839(3), it includes financial, business, technical and economic information, including plans, methods, processes and procedures, and derives independent economic value from not being known to Meridian's competitors who can obtain economic value from use of same to become a BSP registered OPS.

66. The Virtual Account Analytics Dictionary likewise contains trade secrets, as it includes financial, business and economic information, and derives independent economic value as its disclosure to competitors would permit them to understand how Meridian values fund flows through virtual bank accounts using metrics it took Meridian years to develop.

13

67. The Pricing Proposal Spreadsheet also contains trade secrets, as it includes financial, business and economic information, and derives independent economic value as its disclosure to competitors would permit them to undercut Meridian and persuade the customer to join another platform.

68. It is also a trade secret because it is a customer list, which the Second Circuit has repeatedly concluded constitute trade secrets.

69. The information in these documents is not publicly available and Meridian took assiduous efforts to protect the secrecy of such information by storing said documents on a password protected Google Drive and restricting employee access to same within the Google Drive and requiring employees to sign confidentiality agreements.

70. The means used by Mr. Saker in misappropriating these documents, by downloading same after giving notice was intentional, malicious, unlawful, unfair and otherwise improper.

71. Upon information and belief, Mr. Saker misappropriated Meridian's trade secret for his own benefit and for the benefit of his future employer Fin.com, a direct competitor of Meridian.

72. As a direct and proximate cause of said misappropriations, Meridian suffered and continues to suffer substantial damages, including without limitation divulgement of its proprietary and confidential information and loss of economic advantage.

73. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Meridian is entitled to injunctive relief to prevent any actual or threatened misappropriation of its trade secrets.

74. Pursuant to 18 U.S.C. § 1836(b)(3)(B), Meridian is entitled to recover damages for the actual loss caused by the misappropriation and damages for any unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss.

75. Pursuant to 18 U.S.C. § 1836(b)(3)(C), because Defendant's misappropriation was willful and malicious, Meridian is entitled to exemplary damages in an amount not more than two times the amount of damages awarded under 18 U.S.C. § 1836(b)(3)(B).

76. Pursuant to 18 U.S.C. § 1836(b)(3)(D), because Defendant's misappropriation was willful and malicious, Meridian is entitled to recover reasonable attorney's fees.

77. Meridian will continue to be directly and proximately damaged if Mr. Saker is not immediately and permanently enjoined from further accessing, using and disclosing Meridian's proprietary and confidential information.

78. Meridian has no adequate remedy at law and is suffering irreparable injury and damages as a result of Mr. Saker's actions.

## SECOND CLAIM FOR RELIEF
### Misappropriation of Trade Secrets under New York Law

79. Meridian hereby adopts and realleges the allegations set forth in all of the preceding paragraphs above as if set forth fully herein.

80. The information identified herein as trade secrets, including but not limited to the information identified in paragraph 46 above, constitute trade secrets under New York law.

81. Each of the trade secrets identified herein: (a) is not generally known or ascertainable outside of Meridian's organization or control; (b) is known only by employees and others in the business with a need to know; (c) was protected by measures taken by Meridian to guard the secrecy of the information; (d) has value to Meridian and its competitors; (e) was

developed through significant effort and expenditure by Meridian; and (f) could not be properly acquired or duplicated by others without misappropriation.

82. Mr. Saker acquired Meridian's trade secrets in breach of his agreements with Meridian, including the Confidentiality Agreement, and in breach of his duties of confidence and loyalty owed to Meridian.

83. As a direct and proximate result of Mr. Saker's misappropriation of trade secrets, Meridian has suffered and will continue to suffer irreparable harm and damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Breach of Contract**

84. Meridian hereby adopts and realleges the allegations set forth in all of the preceding paragraphs above as if set forth fully herein.

85. Meridian hereby adopts and realleges the allegations set forth in ¶¶1-62 above.

86. Pursuant to Employment Agreement, Mr. Saker agreed to "not assist any other person or organization in competing with the Company [defined as Meridian] or in preparing to engage in competition with the business or proposed business of the Company."

87. By his conduct detailed above, Mr. Saker breached his contracts with Meridian, including Section 1(b) of the Employment Agreement prohibiting him from competing with the company or engaging in any activities "detrimental to the best interests of the Company without the prior written consent of the Company."

88. He has also breached the Confidentiality Agreement, including Sections 2-8.

89. As a direct consequence of these breaches, Meridian has, at the very least, not received the benefit of the bargain associated with the Employment Agreement and Confidentiality

Agreement with Mr. Saker, and will suffer even greater harm if he is not enjoined from sharing Meridian's confidential information with Fin.com thereby further breaching said agreement.

90. Meridian has performed its own contractual obligations under the Employment Agreement and Confidentiality Agreement.

91. In the event of breach or implied/threatened breach of the Confidentiality Agreement, Meridian is entitled to an injunction restricting Mr. Saker from committing or continuing the breach or implied/threatened breach.

92. As a direct and proximate cause of Mr. Saker's breach, Meridian has suffered, and continues to suffer, substantial damages, including without limitation, loss of economic advantage and denial of its bargained for exchange; and accordingly, Meridian is entitled to damages in an amount to be determined at trial.

93. Meridian will continue to be directly and proximately damaged if Mr. Saker is not immediately and permanently enjoined from further breaching the Employment Agreement and Confidentiality Agreement and prohibited from accessing, using and disclosing Meridian's proprietary and confidential information.

94. Meridian has no adequate remedy at law and is suffering irreparable injury and damages as a result of Mr. Saker's actions.

### FOURTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty

95. Meridian hereby adopts and realleges the allegations set forth in all of the preceding paragraphs above as if set forth fully herein.

96. Meridian hereby adopts and realleges the allegations set forth in ¶¶1-76 above.

97. As COO and a senior executive of Meridian, Mr. Saker owed fiduciary duties of loyalty and good faith to Meridian.

98. Those fiduciary duties required him to act in the best interests of Meridian and to refrain from using his position or access to confidential information for his own personal benefit or for the benefit of others at Meridian's expense.

99. Mr. Saker also has a common law duty of good faith and fair dealing to his employer not to exploit its confidential information for the benefit of himself and others. This duty exists both during and after the employment relationship.

100. Mr. Saker breached his fiduciary duties to Meridian by systematically downloading Meridian's trade secrets and confidential proprietary business information after giving notice for the purpose of using such information for his own benefit and/or for the benefit of his new employer, Fin.com.

101. Mr. Saker breached his fiduciary duties to Meridian by acting in bad faith and disloyally during the period leading up to his resignation while still employed by and receiving compensation from Meridian.

102. Mr. Saker breached his fiduciary duties to Meridian by preparing to compete with Meridian using information in its own confidential documents while still employed by it.

103. Mr. Saker's breach of fiduciary duty was willful and malicious, as evidenced by his systematic downloading of confidential documents unrelated to his work obligations, his downloading of documents after giving notice, and his consciousness of guilt as demonstrated by his conflicting conduct regarding the Termination Certification.

104. As a direct and proximate result of Mr. Saker's breach of fiduciary duty Meridian suffered and will continue to suffer damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### Faithless Servant

105. Meridian hereby adopts and realleges the allegations set forth in all of the preceding paragraphs above as if set forth fully herein.

106. Under the faithless servant doctrine, a person is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties as employee.

107. An employee who is faithless in the performance of his duties is not entitled to recover salary or commission.

108. Mr. Saker was faithless in performance of his duties as COO and used his position to obtain access to trade secrets and confidential documents for use by his future employer, Fin.com, a direct competitor of Meridian.

109. Meridian is entitled to recover all compensation he received from and after his first disloyal act, under the faithless servant doctrine.

## JURY DEMAND

110. Meridian hereby demands a trial by jury.

WHEREFORE, Meridian demands judgment on all claims for relief and an award of equitable and monetary relief, as follows:

(a) Temporary, preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 65 and 18 U.S.C. § 1836(b)(3)(A) prohibiting:

    (i) Mr. Saker from retaining any secret, confidential or proprietary information belonging to Meridian that is in tangible form (including computer files, removable media "thumb" drives, electronic files or in any other electronic form, and hard copy documents) and instead returning all copies of such documents, material, computer files and other data to Meridian;

    (ii) Mr. Saker from using or disclosing Meridian's confidential, proprietary and trade secret information;

      (iii)    Mr. Saker from modifying, deleting, altering or destroying any communications, files, documents, materials or data obtained or removed from Meridian, or reflecting information accessed or obtained from Meridan, including any confidential information, and documents or other evidence reflecting the removal, use or disclosure of any confidential information including but not limited to printed documents or data in any electronic format, however stored, including any type of computer, disk, storage device or otherwise, or destroying evidence of the accessing, transfer, copying, use or disclosure of such information;

(b)    Compensatory and exemplary damages against Mr. Saker pursuant to 18 U.S.C. § 1836(b)(3)(B) and (C) to recover for his unlawful acts as described herein, doubled because his misappropriation was willful and malicious;

(c)    Disgorgement of Mr. Saker's compensation under New York's faithless servant doctrine;

(d)    Costs and reasonable attorneys' fees associated with bringing this action pursuant to 18 U.S.C. § 1836(b)(3)(D);

(e)    Prejudgment and post-judgment interest on the judgment amount; and

(f)    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 27, 2026

AMINI LLC

/s/ Lita Beth Wright
Lita Beth Wright
Jeffrey Chubak
Jordan Reisch
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
bamini@aminillc.com
jchubak@aminillc.com
jreisch@aminillc.com
Attorneys for Plaintiff